Filed 7/31/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re S.P., a Person Coming Under Juvenile Court Law. | B302804 |
| _____ | (Los Angeles County Super. Ct. No. 18CCJP07212A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| S.P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen C. Marpet, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

For the second time in less than a year, this court is presented with a parent who was denied notice of jurisdiction and disposition hearings, and later saw his parental rights terminated. In *In re. AI.J.* (2019) 44 Cal.App.5th 652, the parties acknowledged that "father was not properly notified" of the jurisdiction and disposition hearings. (*Id.* at p. 665.) We found the error prejudicial and reversed. (*Id.* at p. 675.) Here, we agree with father that the Department of Children and Family Services (DCFS) did not act with due diligence in locating and notifying him of the jurisdiction and disposition hearings. However, we find the error was harmless and affirm.

Father appeals from the order terminating his parental rights to his child born in 2018. His sole challenge is the denial of his Welfare and Institutions Code section 388 petition, in which he sought to vacate all relevant jurisdiction and disposition findings for which he received no notice.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and father are not married, and have two children together: "baby" (who is at issue in this dependency proceeding) and "son," who was in the dependency system since birth due to the parents' drug abuse and was adopted during the pendency of baby's case. Mother also has five older children – none with father – all of whom were prior dependents of the juvenile court and eventually adopted. At the time of the filing of these proceedings, baby resided with mother.[2]

---

[1]    All subsequent statutory references are to the Welfare and Institutions Code.

[2]    Mother has not appealed the order terminating parental rights.

2

### 1.    *DCFS Involvement*

On October 16, 2018, father was arrested for possession of narcotics and controlled substance.  Five days later, DCFS received a referral that the parents had neglected then- nine-month-old baby.  DCFS investigated, and mother tested positive for methamphetamine and amphetamine.

On November 5, 2018, the juvenile court issued a removal order for baby.  When served, mother was uncooperative, appeared under the influence of drugs and alcohol, refused to permit the social worker inside the apartment, and refused to disclose baby's whereabouts.  Even with law enforcement intervention, mother refused to disclose baby's location, so baby was detained "at large."  Baby was physically detained a few days later.

On November 7, 2018, the social worker sent written notice by certified mail to father's last known address in Huntington Park, informing father of DCFS attempts to contact father and asking him to get in touch with DCFS.

On November 8, 2018, DCFS filed a section 300 petition under subdivisions (b)(1) and (j), alleging as to mother (1) baby was at risk due to mother's 12-year history of illicit drug use and her current use of amphetamine and methamphetamine, and (2) mother had failed to reunify with baby's six siblings, all of whom were permanently placed with other families.  The petition also alleged:  (1) father had failed to protect baby and son from mother's illicit drug use, (2) father had a history of substance abuse, which rendered him unable to provide regular care of baby, and (3) son was a prior dependent due to father's substance abuse and had been permanently placed.

On November 9, 2018, mother filed a Parentage Questionnaire indicating she believed father was baby's father and identified the

names of the paternal grandmother and aunt.  Mother indicated she did not know how to locate father.

On November 9, 2018, the juvenile court held the detention hearing.  Father was not present.  The court questioned mother regarding baby's paternity, and mother identified father as the biological father.  Mother did not know where father currently resided and did not have his phone number, but identified by name the paternal grandmother and the paternal aunt.  Mother said her information was limited, she had no contact information for the paternal relatives, and she had never been to the paternal grandmother's home.  The court found father only to be baby's alleged father and ordered DCFS to conduct a due diligence search for him.  The court detained baby in foster care, with monitored visitation for parents.  Baby was placed in the home of a non-related extended family member.

## 2.    *DCFS's Investigation*

Mother and father had extensive criminal histories.  Father's dated to 2011 when father was 13.  His record included drug possession and sale, unlawful possession of paraphernalia, vandalism, and burglary.  On December 28, 2018, early in the present dependency case, he was arrested for theft.[3]  Mother also had a criminal history involving drugs and theft dating back to her minority.

Mother's history with DCFS started in 2006.  Although she had previously been provided family reunification services, she lost custody of six children to adoption due to her drug use.  One of those children was mother's first child with father, a child who was

---

[3]    As we discuss, father would be arrested three more times during the dependency proceedings.

4

adopted in July 2019.  Mother informed DCFS that mother and father used drugs together when she was pregnant with their first child.  Mother and father separated when she was three months pregnant with baby because mother had decided to get clean but father would not stop using.  DCFS confirmed father's history of substance abuse, and reported that he was recently arrested for drug possession and had attempted to forcibly enter mother's home.

DCFS recommended no family reunification services for the parents, given their extensive history of substance abuse, mother's failure to reunify with any of her children, the parents' failure to reunify with their older son, and father's unknown whereabouts.

### 3. *Jurisdiction, Disposition, and Due Diligence Finding*

On January 14, 2019, the juvenile held the jurisdiction hearing.  The court found baby to be described by section 300, subdivision (b)(1), due to mother's history of illicit drug use and current use of amphetamine and methamphetamine, father's failure to protect baby from mother's illicit drug use, the dependency proceedings and ultimate adoption of their older son, and father's failure to protect older son from mother.  The court sustained the petition as to mother.

As for father, the court received DCFS's Due Diligence Report dated January 14, 2019 and signed six days earlier.  Although the report references some 17 "search sources," under No. 12 "Relatives/Friends," the DCFS investigator wrote:   "No contact letters were sent to relatives/friends."  The juvenile court found, "due diligence has not been completed as to father."  Included in the minute order for that date was, "The court will put the Jurisdictional hearing over further to allow the Dept to submit the completed due diligence search of the father as to the subdivision B-2 count."  The court scheduled father's jurisdictional hearing for February 13, 2019.

5

In an addendum report dated February 13, 2019, DCFS included the following section:

> **"Due Diligence for father, [S.P.]**
>
> "A Due Diligence Report was submitted for the father, [S.P.] The Department of Children and Family Services was not successful in locating [S.P.].
>
> "(The court is respectfully referred to the attached Due Diligence Report.)"

In the Clerk's Transcript, the document that follows the February 13th report is not a new Due Diligence Report, but the report dated January 14, 2019—the same report on which the juvenile court based its finding on January 14th that "due diligence has not been completed for father." There does not appear in the record a supplemental Due Diligence Report prepared shortly before the February 13, 2019 hearing. For reasons that are not clear from the record, at this hearing, the juvenile court found "that the Dept has completed the due diligence search for the father."

The court, having found jurisdiction as to father, proceeded to the disposition hearing. The court admitted the due diligence report, a letter from mother's drug rehabilitation center, and testimony from mother. The court declared baby a dependent of the court, ordered baby removed from parental custody, denied family reunification services for mother and father pursuant to section 361.5, subdivision (b)(10) and (11), and set the case for a permanency planning hearing on June 12, 2019.[4] The court found that due diligence had been

---

[4] Section 361.5, subdivisions (b)(10) and (11), provides that the juvenile court need not order reunification services when the court previously had terminated parental rights to the child's sibling or half sibling or where it previously ordered termination of reunification services when the parent failed to reunify with a

6

completed as to father. The court stated: "The court did put the trial and dispo[sition] over for father. We do have good notice and I'm ordering – finding that the petition is sustained as pled as to the father. No [family reunification] for the father." The court found family reunification was not in baby's best interest.

### 4. *Post Disposition Events*

Baby developed a strong bond with his caregiver, who wanted to adopt him.[5] Mother, meanwhile, failed to maintain regular contact with baby.

Approximately a month after the detention hearing, on March 21, 2019, father was arrested for vehicular theft. On April 4, 2019, father was arrested again, this time for possession of narcotics. Four days later, father was arrested for an earlier incident in which he had threatened mother with a handgun at her home. He was charged with terrorizing and dissuading a witness by threat or force.

On May 23, 2019, father was personally served in custody for the previously scheduled June 12, 2019 hearing on termination of parental rights. Father, still incarcerated, made his first appearance at that hearing. Father informed the court that his address was the paternal grandmother's home in Cudahy. Father said he had been sentenced to 16½ months in prison, had been given a strike, and did not yet have a release date.[6]

---

sibling or half sibling, and the parent or guardian had not subsequently made reasonable efforts to address the problems leading to removal of the sibling or half sibling.

[5] The caregiver was approved for adoption on April 10, 2019.

[6] Father would remain in custody through baby's section 366.26 hearing, which took place on November 21, 2019.

In October 2019, DCFS reported baby continued to progress well in the caregiver's home. During monthly home visits, DCFS observed baby was appropriately bonded with the caregiver and her adult children, he called the caregiver "mom," followed the caregiver around the home, and enjoyed being nurtured by her. DCFS assessed that baby's needs were met by the caregiver and observed no safety concerns. Baby was receiving services through Regional Center, was meeting his developmental milestones, and appeared comfortable in the home. The caregiver and her husband were committed to providing baby with a permanent home through adoption.

## 5. *Father's Section 388 Petition*

On October 8, 2019, father filed a section 388 petition, challenging the juvenile court's jurisdictional findings and dispositional orders for lack of proper notice. Father also asserted that granting the petition was in the best interest of baby because father "has an interest in reunifying with his child," father wanted baby "placed with his relative, the paternal aunt" and baby "benefits from being with his father and paternal relatives." The only statement father made about contact with baby was that he "had visits with his child, and took the child in his home prior to [his] incarceration."

On November 5, 2019, baby's caregiver reported that neither father nor any member of the paternal family had ever contacted her to inquire about baby. On November 15, 2019, DCFS filed its report setting out the significant facts we have already detailed and addressing father's section 388 petition. DCFS noted father provided no evidence that he had addressed his substance abuse. DCFS recommended that the court deny father's section 388 petition and proceed with adoption. In a subsequent report on November 21,

8

2019, DCFS reported that father had made no efforts to contact the social worker or the caregiver.  The social worker again asked  the juvenile court to deny the section 388 petition.

Father filed points and authorities supporting his claim that DCFS had not acted with diligence in attempting to provide notice of the jurisdiction and disposition hearings. Specifically, he claimed DCFS failed to contact the paternal grandmother and aunt regarding father's whereabouts.  Father also said that it was in baby's best interests to vacate the findings and orders because father and baby then could establish a parent- child bond.  Father's points and authorities did not provide any details about his alleged contacts with baby.

**6.** *Denial of the Section 388 Petition and Termination of Parental Rights*

On November 21, 2019, the juvenile court held the combined hearing on the contested section 388 petition and the section 366.26 hearing.  Father was present but still incarcerated.  Father's counsel argued father was never given the opportunity to create a bond with baby because he was not properly noticed or afforded visitation.

Baby's counsel asked the court to deny the petition.  Counsel argued father had failed to meet the best interest requirement for section 388 relief:  baby had been placed with his caregiver for almost a year, and father remained incarcerated.  DCFS's counsel argued father and the paternal relatives knew that mother had given birth to baby and reportedly were told by mother that baby had been placed with a family.  However, paternal relatives had made no effort to contact baby, and father had not attempted to forge a relationship with baby even during the time he was not in jail.  Father's counsel did not contradict DCFS's statements regarding father's lack of contact.

9

The juvenile court denied the petition, finding that father had not demonstrated that granting the petition would be in baby's best interest. The court stated, "At this point, based upon the report before the court and *Justice P*.[7] There is not a sufficient bond and it is certainly not in this child's best interest so I'm going to deny the 388."

The juvenile court then proceeded to the section 366.26 hearing. DCFS recommended the parents' parental rights to baby be terminated. Mother's counsel indicated she had no direction from mother. Father's counsel stated if the court's tentative were to terminate parental rights, he was objecting for the record.

The juvenile court found by clear and convincing evidence baby was adoptable and would be adopted, and terminated parental rights.

On December 5, 2019, father filed a notice of appeal from the termination of his parental rights.

### DISCUSSION

Father argues that the court should have granted his section 388 petition because he did not receive notice of the jurisdiction and disposition hearings, and that granting the petition would be in baby's best interests. Father argued in the trial court and repeats on appeal that DCFS failed to use due diligence in trying to locate him to give him notice of those hearings. Specifically, he claims DCFS failed to contact the paternal grandmother or aunt for father's whereabouts, even though mother had provided their names to the social worker.

### 1. Section 388, Due Process Notice, and Harmless Error

Section 388 affords a party a limited right to seek modification

---

**7**      In re *Justice P.* (2004) 123 Cal.App.4th 181 (*Justice P.*).

of a prior dependency order.  The elements for relief are well known: the moving party must show that (1) there is new evidence or changed circumstances, and (2) a change in the order is in the best interest of the child.  (§ 388; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  The decision of the trial court is typically reviewed for abuse of discretion.  (*Ibid*.)  Some courts, however, use a  bifurcated substantial evidence/abuse of discretion standard.  (See, e.g. *In re J.M.* (2020) 50 Cal.App.5th 833, 846 ["We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence."].)

Nearly 35 years ago, the Court of Appeal in *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 490, held that a section 388 petition could be used to challenge lack of notice of earlier proceedings.  There, the father had apparently left town following an arrest for assault, and intentionally left no forwarding address.  (*Id.* at p. 489.)  The appellate court found, "There is no evidence on the record that the Department made any attempt to serve petitioner with notice of the proceedings." (*Id.* at p. 481.)  Two years later, the father received notice of the Department's motion to terminate parental rights.  He then appeared in the dependency proceedings and filed a section 388 petition.  The 388 petition was based on father's lack of notice of the proceedings that had been ongoing for two years.  (*Id.* at p. 482.)  The trial court denied the petition, stating that the language of section 388 – " 'change of circumstances or new evidence' – permits motions based upon '. . . a change of circumstances of a child' " only.  (*Id.* at p. 483.)

The *Ansley* court had no occasion to consider whether any error was prejudicial – the trial court had determined as a matter of law that section 388 could not there be utilized.  The Court of Appeal disagreed and remanded for a hearing.  (*Ansley v. Superior Court*

11

(1986) 185 Cal.App.3d at p. 483.)

The parties in the present appeal do not dispute that section 388 is the proper vehicle for a due process challenge, or that the abuse of discretion standard of review applies. Nor do they diverge on whether any erroneous ruling made by the trial court should be put to a harmless error test.

We agree on all counts. Nevertheless, we observe that this appeal does not ask us to consider a more typical section 388 petition, in which a parent asks the court to change a prior order because, for example, the parent completed a drug program or recent history supports that monitored visitation should become unmonitored. The claimed error here – lack of notice – is of constitutional dimension. (*Justice P.*, *supra*, 123 Cal.App.4th 181, 189.) "Due process requires that a parent is entitled to notice that is reasonably calculated to apprise him or her of the dependency proceedings and afford him or her an opportunity to object. [Citation.] The child welfare agency must act with diligence to locate a missing parent. [Citation.] Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith." (*Id*. at p. 188.)

The lack of due process in a dependency proceeding raises the specter of structural error but this approach was firmly rejected by our Supreme Court in *In re James F.* (2008) 42 Cal.4th 901, 915-916. "The harmless error analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension." (*In re J.P.* (2017) 15 Cal.App.5th 789. 798 (*J.P.*).)[8]

---

[8]     *J.P.* involved the wrongful denial of right to counsel. Justice Baker in his concurring opinion in *J.P.* warned that in applying a harmless error analysis to every denial of right to counsel in a dependency case may be inappropriate. "But for

As we observed in *AI.J.*, some courts of appeal have applied a Chapman[9] "harmless beyond a reasonable doubt" standard (e.g. *In re J.H.* (2007) 158 Cal.App.4th 174, 173; *Justice P.*, *supra*, 123 Cal.App.4th at p. 193). At least two Supreme Court cases have embraced the *Watson*[10] more probable than not standard. (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 625 [incarcerated father not brought to court for hearing]; *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [failure to appoint separate counsel for siblings]). In *AI.J.*, *supra*, 44 Cal. 5th at page 666, we found that under either standard, the failure to provide notice was harmless.

Here we apply the *Watson* standard, "which requires the appellant to show a reasonable probability of a more favorable outcome." (*AI.J.*, *supra*, 44 Cal.App.5th at p. 665.) We only reverse if "it reasonably probable the result would have been more favorable to the appealing party but for the error." (*Ibid.*)[11]

---

cases in which there is an egregious deprivation of the foundational right to counsel, we should do more thinking. When a counterfactual inquiry appears too difficult to responsibly undertake, or a counterfactual conclusion relies on inferences that really amount to guesswork, the bias should be in favor of reversal." (*J.P.*, *supra*, 15 Cal.App.5th at p. 804.) Appellant's brief focuses on lack of notice although implicit is that he had no counsel because he received no notice.

[9]     *Chapman v. California* (1967) 386 U.S. 18.

[10]     *People v. Watson* (1956) 46 Cal.2d 818.

[11]     We observe father and DCFS assert an abuse of discretion standard applies here to evaluate the constitutional error in the context of a section 388 petition.

## 2. *Application of Principles to the Present Case*
### A. **Due Diligence**

The juvenile court continued the January 14, 2019 jurisdiction hearing as to father because as of that date the court found DCFS had not acted with due diligence in trying to locate father. At that time, DCFS had searched multiple sources for information on father's whereabouts but expressly stated it had not contacted paternal relatives who mother had identified. The court continued the jurisdiction hearing as to father to allow DCFS additional time to locate father. On February 13, 2019, at the combined jurisdiction hearing for father and disposition hearing for both parents, the trial court stated, "We do have good notice." The minute order for that date included, "Court finds due diligence has been completed for father." In fact the record does not disclose that any further diligence was undertaken. For example, it was undisputed that DCFS had not contacted the paternal grandmother or aunt. Yet, DCFS told the court that the parental relatives knew of mother's pregnancy. At a minimum, inquiring of paternal relatives as to father's whereabouts was required.[12]

Considering that DCFS conducted no additional due diligence between January 14th (when the court found diligence inadequate) and February 13th (where the court found it sufficient), and DCFS

---

[12] At the hearing where the section 388 petition was denied and parental rights were terminated, DCFS's counsel told the court: "The father, the paternal grandmother, the parental aunt all knew that mother was pregnant, all knew the mother had given birth but relied on statements from the mother saying that she had placed the child with family members." Even if the representation about placement was true, it does not explain DCFS's failure to contact the parental relatives in an effort to locate father.

14

never asked the parental relatives for father's whereabouts, we conclude efforts to locate and notice father were deficient.

### B. Harmless Error

We apply the *Watson* standard to determine whether the failure to provide notice was prejudicial. Father has not shown that there was a reasonable probability of a more favorable outcome (i.e. that he would have been granted reunification services and his parental rights would not have been terminated) absent the error in giving notice.

Father's history did not support an order of reunification services. Father does not argue the contrary. The juvenile court found reunification services were properly denied under section 361.5. Under section 361.5, reunification need not be ordered where the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent . . . ." (§ 361.5, subds. (b)(10) and (11).) The court's decision was supported by the record.

Father lost his first child (son) to adoption, following termination of reunification services in that case. The record is devoid of evidence that father made an effort to address the problems that led to the denial of reunification services for son and the termination of father's parental rights to him. Father had an extensive criminal history that included four arrests and significant incarceration during the pendency of this case. In one incident, father was charged with threatening mother with a handgun. Father's history of substance abuse was equally troubling. It was apparently unresolved as of the 388 hearing. At a minimum, father failed to produce evidence that he had addressed his drug abuse.

The record makes clear that from the time he was served in May 2019 until the filing of his October 2019 section 388 petition,

father was incarcerated, but did not seek visitation or other reunification services. Even before his incarceration, there was no evidence father formed any kind of bond with baby. Although his section 388 petition asserted that he had contact with baby and brought him into his home, there was no evidence to support the assertion, which was essentially abandoned by counsel at the hearing.[13]

Father asserts that if the juvenile court had found father to be the presumed father, there would have been a preference to place baby with his paternal relatives. "Only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services, and only a presumed father is entitled to custody of his child." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596; § 361.5, subd. (a).) In none of the papers filed with the juvenile court did father ask to be granted presumed father status. To the extent he now claims the trial court erred in not according him presumed father status, the point is thus waived. As we explain below, even if the juvenile court had granted presumed status, the outcome would be no different.

On appeal, father nominates paternal aunt as a potential caregiver. Yet, the aunt specifically told DCFS that baby would likely not be placed with her because she had an extensive criminal record and was a recovering methamphetamine user who had been sober for only one year (as of the hearing on the 388 petition). The aunt thought baby could be placed with the paternal grandmother.

---

[13] Because the juvenile court denied father's petition, we imply necessary findings that support the decision, to the extent they are based on substantial evidence. (See *In re Andrea G.* (1990) 221 Cal.App.3d 547, 554–555.) Here, we imply that the court found father's vague assertion that he had had contact with baby either not credible, or legally insignificant.

However, the grandmother had a history of homelessness, and the woman who answered the door at the grandmother's alleged residence told DCFS grandmother did not live there.

Neither the grandmother nor the aunt made an effort to see baby during the dependency case, which the grandmother said they learned about in May or June 2019. When asked in November 2019 why she had not visited, the aunt reported she lost the social worker's phone number and that "the family was quite unstable and did not have a permanent home in the months following the child's detention." The grandmother claimed that she could not visit because she was too busy with work. Even if father had been accorded presumed father status, father would be faced with the fact that neither paternal grandmother nor aunt were likely placement candidates.

Given the fact that father had lost reunification services and then custody to son, father's proposed paternal caregivers were either unwilling or unqualified, father's illicit drug use remained unaddressed, and father continued to commit violent acts (including toward mother) during the early pendency of this case, we conclude our affirmance stands not on guesswork or speculation, but on the undisputed facts before us. Under the *Watson* standard, it is not reasonably probable that absent the notice error, father would have been granted reunification services or his parental rights would not have been terminated. (Cf. *AI.J.*, *supra*, 44 Cal.App.5th at p. 666.)[14]

_____

[14] In a more traditional 388 petition, the facts we have considered under harmless error would likely have been analyzed as part of the second part of section 388 that the parent demonstrate granting relief would be in the child's best interests. Because we conclude that father has not suffered prejudicial error from his lack of notice, he has not demonstrated the required changed circumstance or new evidence – the first

## *DISPOSITION*

The juvenile court's order terminating parental rights is affirmed.

RUBIN, P. J.

I CONCUR:

MOOR, J.

---

element of section 388. Other than to observe that the facts presented here would be equally applicable to an inquiry of the best interests of the child, we do not further address the point.

We also observe that this case again shows the doctrinal challenges of using the section 388 vehicle to challenge constitutional errors as to notice or right to counsel. The trial court found that notice was sufficient. That should have ended the inquiry because once it had been established there were no changed circumstances, it was unnecessary to address the second part of section 388 – the bests interests of the child. The juvenile court nevertheless proceeded to the second step, relying on *Justice P.* Conversely, in *AI.J.*, we concluded that, because of the failure to give adequate notice, the father had demonstrated changed circumstances. The trial court's contrary ruling was incorrect and prejudicial. But a literal application of section 388 would have required the court to then address the second element of best interests of the child. The court in *AI.J.* does not address the second factor, but without real consequence – the facts that supported the court's decision that lack of notice was prejudicial error, would undoubtedly have supported a finding that modifying the earlier order was in the child's best interest. It may be time for either our Supreme Court to revisit or refine *Ansley*'s holding that a constitutional error in notice or counsel can be raised under section 388, and it may be time for the Legislature to consider placing such errors on independent footing not tied to section 388.

18

In re S.P.
B302804


BAKER, J., Dissenting


Today's majority opinion is further evidence the courts of appeal are applying harmless error doctrine in juvenile court cases to excuse fundamental constitutional errors—errors that strike so deeply at the edifice of our legal system that, despite all pretenses, judges have no realistic ability to determine the probability of a different outcome absent the error. I do not believe this state of affairs is required by our Supreme Court's decision in *In re James F.* (2008) 42 Cal.4th 901 (*James F.*), and I accordingly dissent.


I

Dependency proceedings in this case began in October 2018 when the Los Angeles County Department of Children and Family Services (Department) received a referral that minor S.P.'s mother (Mother) was neglecting the child. The Department's subsequent investigation revealed Mother was using methamphetamine. Pursuant to court order, the Department removed S.P. from Mother's custody and filed a dependency petition in November 2018.

Once dependency proceedings were underway, Mother completed a parentage questionnaire identifying S.P.'s father

(Father) by name, as well as the names of S.P.'s paternal grandmother and paternal aunt.  Mother claimed she had no contact information for Father, and the Department sent a certified letter regarding the commencement of dependency proceedings to what it thought was Father's last known address.  The juvenile court ordered the Department to conduct a "due diligence" search for Father to give him notice of the proceedings.

By the time of a jurisdiction hearing in January 2019, the Department had not located Father and had not notified him of the pending dependency case.  The Department's jurisdiction report stated a separate due diligence report on Father had been submitted and was "pending completion."  (The Department had already managed to successfully complete a criminal history check on Father.)  The juvenile court continued the jurisdiction hearing as to Father (proceeding only against Mother) to give the Department time to complete its due diligence report.

The Department submitted another due diligence report to the court in February 2019 and it was not materially different from the prior report.  It stated the Department ran various database searches in an unsuccessful effort to ascertain Father's whereabouts, including searches of records maintained by the Los Angeles County Probation/Parole Office, the Los Angeles County Sheriff's Department of Inmate Information Center, the California Department of Corrections, the DMV, and the Federal Bureau of Prisons.  The Department's report also stated the Department did not attempt to contact any of Father's relatives or friends because there was "no information regarding any potential relatives/friends."  That, of course, was false.  Mother previously identified Father's mother and sister in a parentage questionnaire and in open court.  The Department simply did not

2

contact them in an effort to notify Father of the pending proceedings.

At a hearing that same month (February 2019), the juvenile court found—based on the Department's due diligence report—that there had been "good notice" as to Father. Father was not present at this hearing, nor was there an attorney in court to advocate on his behalf or raise objections to the Department's evidence. The court sustained the dependency petition against Father in absentia and ordered he was to receive no reunification services.

Months later, the Department reported it had located Father and personally served him on March 11, 2019, with notice of the pending dependency proceedings. Father was arrested in April 2019 and remained incarcerated (serving a 16-month sentence for a threats crime) at the time of a June 12, 2019, hearing where he entered his first appearance and was appointed counsel. At that hearing, Father told the court his address was the same as the paternal grandmother's—one of the two family members previously identified by Mother.

The day before the next scheduled hearing in the case, which was a hearing to consider termination of Mother and Father's parental rights, Father filed a Welfare and Institutions Code section 388 petition asking the juvenile court to vacate the prior jurisdiction and disposition orders it made while he had no notice of the proceedings. Father's petition asserted (contrary to what Mother previously told the Department) that he had visited with S.P. and took him into his home before Father was incarcerated. Father also maintained he would have advocated for S.P. to be placed with the child's paternal aunt (rather than the home of a non-related extended family member where S.P.

3

was then placed) if Father had been provided proper notice of the proceedings.

The juvenile court denied Father's request to vacate the prior court orders. The court did not reaffirm its prior finding that the Department had made good efforts to notify Father of the proceedings. Instead, citing a 2004 Court of Appeal case (*In re Justice P.* (2004) 123 Cal.App.4th 181 (*Justice P.*)), the court determined Father was not entitled to a new jurisdiction and disposition hearing in which he could participate solely because the court believed "there is not a sufficient bond and it is certainly not in this child's best interest."

## II

In this court, the Department does not defend the inadequate effort it made to notify Father of the proceedings before the court went forward with a jurisdiction and disposition hearing in his absence. The Department urges affirmance, however, because it believes the error was harmless. By harmless, the Department means Father's lack of notice did not affect the outcome of the proceedings beyond a reasonable doubt—an admittedly counterfactual standard, albeit one more demanding than the majority chooses to apply.

I have previously argued a juvenile court's considered failure to appoint counsel for a parent can be the kind of error that defies harmlessness analysis, and is per se reversible, because it is sometimes too difficult to determine what a parent might have done differently with advice of counsel, not to mention what the attorney would have done differently by way of advocating for a parent. (*In re J.P.* (2017) 15 Cal.App.5th 789, 803 (conc. opn. of Baker, J.) [criticizing the majority's affirmance

4

on harmlessness grounds and quoting *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 150, a case that explains the erroneous deprivation of counsel has "'consequences that are necessarily unquantifiable and indeterminate'" and "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe"].)  In this case, the Department does the majority in *In re J.P.* one better by arguing the absence of any notice of the jurisdiction and disposition proceedings (which naturally means the absence of counsel as well) can be excused on harmlessness grounds too.

This is folly.  We cannot reliably decide whether the outcome of these dependency proceedings might have been different if Father had been permitted to participate in the case from the outset—the various counterfactual possibilities are too numerous to even catalog.  Consider just a few.  Facts in Department reports that the majority relies on to find a lack of prejudice might have been contested and determined not to be facts at all.[1]  Father might have noticed an appeal from the juvenile court's jurisdiction and disposition orders (an appeal that was no longer timely after he made his first appearance and was appointed counsel) and secured a reversal.  Father may have presented a viable plan to arrange for S.P.'s care with the goal of facilitating visitation and possibly taking custody of his child upon his (Father's) release.  Father might have made different decisions and avoided incarceration if he knew the state had commenced proceedings to take custody of his child.  Or Father may have even taken a more proactive approach to dependency

---

[1]    To take one example Father highlights in his section 388 petition, Mother claimed Father had never met S.P. while Father claimed he had visited with the child.

5

court proceedings once he was finally given proper notice if he were not led to believe all that was done in his absence suggested an order terminating his parental rights was probably a fait accompli.

The majority is right, however, that *Justice P.*, *supra*, 123 Cal.App.4th 181, does apply harmless error doctrine to excuse a notice error. Insofar as *Justice P.* forecloses the possibility that notice errors can be per se reversible, we are not bound to follow that opinion—and we should not.[2] The same is not true, of course, of our Supreme Court's decision in *James F.*, *supra*, 42 Cal.4th 901. But that case does not compel the result the majority reaches.

The Supreme Court in *James F.* confronted an undisputed error in the procedure a juvenile court used to appoint a guardian ad litem for a mentally incompetent parent in a dependency proceeding: the court failed to explain, before appointing the guardian, what a guardian ad litem was and failed to give the

---

[2]     *Justice P.* is also quite susceptible of being misread in precisely in the manner in which the juvenile court here misread it. The juvenile court believed the result in *Justice P.* obviated the need to consider the due process implications of the prior lack of notice to Father because the court could simply apply the usual section 388 test and decide whether it thought vacating its prior orders was in S.P.'s best interest. (*Justice P.*, *supra*, 123 Cal.App.4th at 189 ["[A] court may still deny a section 388 petition without an evidentiary hearing if the parent does not make a prima facie showing that the relief sought would promote a child's best interests"].) When a section 388 petition is used as a vehicle to challenge a lack of notice of the proceedings, however, application of the usual section 388 test is insufficient, as even the *Justice P.* court ultimately recognizes. (*Id.* at 193.)

6

parent a meaningful opportunity to be heard in opposition to the appointment. (*James F.*, *supra*, 42 Cal.4th at 911.) The Supreme Court rejected the view that the juvenile court's error was per se reversible "structural error" and cautioned that "the structural error doctrine that has been established for certain errors in criminal proceedings should [not] be imported wholesale, or unthinkingly, into the quite different context of dependency cases." (*Id.* at 915-916.)

Though *James F.* rejects wholesale importation of per se reversible error doctrine into the dependency arena, including on the specific facts of that case, the opinion leaves open the possibility that a sufficiently serious, fundamental dependency court error might require reversal without the need to conduct a harmlessness inquiry. That much is clear from the *James F.* court's recognition that United State Supreme Court precedent holds there are certain errors that "'defy analysis by "harmless-error" standards'" (*James F.*, *supra*, 42 Cal.4th at 916-917) and the care the *James F.* court took to emphasize there was no argument that the error in that case defied such analysis—as contrasted with a more problematic scenario in which a parent might lack actual notice of the dependency proceedings (*id.* at 917 ["The record does not support the Court of Appeal majority's dramatic assertion that appointment of a guardian ad litem for [the parent] 'stripped [him] of his right to participate' in the action. Nothing suggests that Marcus was unable to express his wishes to the court, either directly or through his appointed guardian, *that he lacked actual notice of the proceedings as they unfolded*, that the guardian and the attorney appointed for Marcus failed to properly advocate for his parental interests, or that Marcus ever expressed dissatisfaction with the guardian ad

7

litem or asked the juvenile court to vacate her appointment"], italics added).

A lack of actual notice of the proceedings as they unfolded is precisely the error we confront here. *James F.* does not bar finding this type of fundamental error to be per se reversible, and that is what we should do for the reasons I have already given.

### III

A harmlessness inquiry is usually required before reversing juvenile court dependency orders, and rightly so. But it is also true that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (*Troxel v. Granville* (2000) 530 U.S. 57, 66.) The cornerstone of that right is the familiar basic requirement of notice and an opportunity to be heard. (*Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314.) When a parent has no notice of a jurisdiction and disposition hearing that results in an order for the state to assume jurisdiction over the parent's child, and when the parent later complains about that lack of notice, the juvenile court should be required to redo the hearing because assessing prejudice will ordinarily be too difficult. Some consequences of a lack of proper notice may still be unrepairable, but holding the hearing anew is the best available means of assessing the impact of a fundamental notice error. If instead the majority's harmlessness approach here is to be the rule, one is left to wonder why we even go to the trouble of holding juvenile court hearings in every case. It would be a lot faster and easier

8

for judges to first read Department reports and then decide whether it is worth hearing from the parents at all.


BAKER, J.